# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHAD WEILER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14 C 4991 |
| ) | |
| VILLAGE OF OAK LAWN ) | |
| and LARRY DEETJEN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Chad Weiler has sued the Village of Oak Lawn and Village Manager Larry Deetjen, alleging they violated several federal and state laws when they eliminated the Village's Department of Business Operations, of which Weiler was the sole employee. Weiler accused Deetjen of making racist remarks, and he alleges that the Village eliminated his department in retaliation. Defendants have moved for summary judgment on all claims. The Court enters summary judgment in defendants' favor on the federal claims and dismisses the state law claims without prejudice for the reasons laid out below.

## Background

1.  **Facts**

On July 25, 2005, the Village's then-Mayor David Heilmann appointed plaintiff Weiler as the Director of the Village's Department of Business Operations. As the Department's sole employee, Weiler was responsible for cultivating economic

development in the Village, coordinating the maintenance of Village grounds, and planning special events.  Defs.' Stat. of Facts (SOF) ¶ 5.  Weiler reported to Deetjen, the Village Manager.  As the administrative head of the Village, Deetjen was responsible for the overall administration of the Village's departments.  Deetjen reported to the Village's elected officials by giving presentations at Board meetings and sending weekly Trustee Information Letters to the Board and the Mayor.  Deetjen had the authority to fire employees, but only the Board of Directors could make changes to the organizational structure of the Village.

The events leading up to this suit began with Weiler's allegation that Deetjen made racially discriminatory remarks about a company called JenCare.  JenCare is in the business of providing medical care to seniors.  In early 2013, its representatives, including its manager Dr. Chen, initiated a search for a location for a new facility in the Village.  They considered multiple locations, eventually settling on two sites: a former House of Brides store and a former Men's Warehouse store.  JenCare indicated that the House of Brides site was its first choice, primarily because it required less construction and had adequate parking for JenCare's business needs, pending a parking variance.  Deetjen opposed JenCare leasing the House of Brides site and instead recommended that it lease the Men's Warehouse site.  According to JenCare's president, Deetjen supported the company through the process of leasing the Men's Warehouse location.  He helped the company resolve its parking concerns and get a variance for the Men's Warehouse site.  JenCare eventually opened a location there.

Deetjen's preferences are undisputed—he admits that he opposed JenCare leasing the House of Brides site and instead recommended that JenCare lease the

2

Men's Warehouse site. The motivations for his preferences, however, are hotly disputed and make up part of the basis for Weiler's claims. The Court addresses that issue next.

Deetjen says he opposed JenCare leasing the centrally-located House of Brides site based solely on the economic development goals of the Village and its downtown area. He says he believed JenCare would not be a good fit for the House of Brides site because it would not bring in sales tax revenues or encourage spending in the downtown area. Deetjen felt that a different part of town—where the Men's Warehouse location was located—would be a better fit for JenCare because it was less centrally located and thus had less potential to bring in sales tax revenues.

By contrast, according to Weiler, Deetjen's aversion to JenCare moving into the House of Brides site had little to do with economic development and more to do with racial discrimination. Weiler based his interpretation on two somewhat-vague phrases that he says Deetjen used on April 17, 2013 when discussing his opposition to JenCare leasing the House of Brides site. Deetjen told Weiler that he did not want "that type of clientele" in the downtown area, and he said that JenCare would be better "on the outskirts of town." Id. ¶ 49. Weiler testified that he thought the comments were suspicious based in part on knowledge he had of previous racial allegations surrounding Deetjen. After Deetjen's comments, Weiler went to JenCare's website, where he saw photos primarily featuring African-American and Hispanic patients. Weiler came to believe that Deetjen wanted to keep minorities out of the downtown area.

On April 26, 2013, Weiler attended a meeting with Deetjen and a House of Brides representative named Dale Buziecki. Buziecki expressed frustration at Deetjen's

3

interference and opposition to the JenCare lease and wondered why the parking variance had not been approved. Believing that Deetjen's opposition was based on unlawful discrimination, and fearing an eventual lawsuit against the Village, Weiler reported Deetjen's earlier comments to then-Mayor Heilmann. Over the course of the next two weeks, Heilmann corresponded with the Village attorney, Weiler, and Dr. Chen in an attempt to gain information about the allegations. On May 9, 2013, a Village of Oak Lawn police officer visited Weiler at work to question him about his report of racial discrimination. During that conversation, Weiler recounted the comments that he said Deetjen had made.

On May 13-14, 2013, Mayor-elect Sandra Bury corresponded with Weiler and Dr. Chen. Weiler expressed to her his belief that Deetjen was engaging in racial discrimination against JenCare, and he recounted the "clientele" conversation. Bury asked him for clarification regarding how he determined that Deetjen's comment was directed at minorities. Although Weiler did not offer a full explanation of the basis for his belief, he continued to assert that he felt the comment was discriminatory. Dr. Chen, on the other hand, told Bury that he did not believe race played a role in the site selection process.

On July 2, 2013, Deetjen presented Weiler with a proposed retirement agreement. Under the proposed agreement, Weiler would voluntarily retire and vest in his pension on July 25, 2013. The draft agreement required Weiler to release and waive all claims against the Village, whether known or unknown, that in any way arose from anything that had occurred prior to the date of signing. Weiler testified that he had not spoken with Deetjen regarding retirement prior to receiving the proposed

4

agreement, and he believed there was an implicit threat of termination if he chose not to sign it. The proposed agreement provided that Weiler would have twenty-one days to decide whether to accept or reject it. Ultimately, Weiler did not sign the agreement and Deetjen withdrew the offer on July 23. Weiler continued working for the Village, and he vested in his pension when he reached eight years of service two days later, on July 25.

The Board held a series of meetings in early August 2013 to engage in transition after the Village's election. At a meeting on August 13, Deetjen recommended eliminating the Department of Business Operations, along with a variety of other changes that he offered as cost-cutting measures. The Board discussed the changes and voted in favor of Deetjen's recommendations, including the recommendation to eliminate the Department. As such, Weiler's position was eliminated. At the same time, the Village outsourced its 911 call center and eliminated several custodian positions. Weiler's job duties were partly outsourced to a contractor and partly absorbed by other Village employees. Deetjen estimated that the elimination of Weiler's position saved the Village $50,000, taking into account the cost of redistributing his work. Because Weiler's pension had vested before the vote, Weiler began to receive and continues to receive a monthly $700 pension check.

## 2. Procedural history

Weiler filed this lawsuit on July 1, 2014, alleging that the Village and Deetjen violated his rights under the Constitution and state law when they eliminated the Department. Specifically, he contended that his report of Deetjen's comments to Heilmann was protected by, among other things, the First Amendment. The Court previously dismissed Weiler's federal claims against Deetjen in his individual capacity

based on the doctrine of legislative immunity, and it dismissed Weiler's First Amendment association and Fourteenth Amendment equal protection claims against the Village. Following the Court's ruling on defendants' motion to dismiss, *see Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874 (N.D. Ill. 2015), the remaining claims were Weiler's claims under state law and two of his federal claims. The Court declined to dismiss the state law claims based on defendants' claim of immunity under the Illinois Tort Immunity Act. In that regard, the Court noted a factual dispute concerning whether Deetjen was determining policy when he recommended the elimination of Weiler's department. That factual dispute precluded a finding of state law immunity at the motion to dismiss stage. In their motion for summary judgment, defendants reassert their state law immunity argument and also argue that no reasonable jury could find for Weiler on the federal claims.

## Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant in entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court views the evidence in the light most favorable to the non-moving party. *Id.* at 255.

Weiler contends that the Village violated the First Amendment, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Illinois Civil Rights Act, and the Illinois Human Rights Act. He also contends that both defendants violated the Illinois

6

Whistleblower Act.

1. **Section 1981 and Title VII**

The legal analysis for Weiler's section 1981 claim and his Title VII claim is identical, *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015), so the Court these claims together and uses case law under the two statutes interchangeably. Weiler alleges that the Village violated section 1981 and Title VII by retaliating against him for reporting prohibited conduct. In particular, Weiler argues that when he reported Deetjen's comments to Heilmann, he believed he was reporting conduct that would have violated section 1981 and Title VII. According to Weiler, the Village's decision to eliminate his department—and thus his job—was the direct result of his report. It is unlawful for an employer to discriminate against an employee for opposing a practice made unlawful by Title VII or section 1981. *Fine v. Ryan Airlines*, 305 F.3d 746, 751 (7th Cir. 2002). If a reasonable jury could believe that the Village eliminated Weiler because he engaged in protected conduct, his Title VII and section 1981 claims would succeed.

A plaintiff can establish Title VII and section 1981 retaliation claims via direct or indirect methods of proof. Weiler proceeds under the direct method. *See* Pl.'s Resp. at 12. The direct method requires a plaintiff to demonstrate that 1) he engaged in protected conduct, 2) he suffered an adverse employment action, and 3) his protected conduct caused his adverse employment action. *See, e.g., Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012). The causation element can be proven by direct evidence or circumstantial evidence "which would allow a jury to infer intentional discrimination by the decision-maker." *Hottenroth v. Vill. of Slinger*, 388 F.3d

1015, 1028 (7th Cir. 2004).

### a. Protected conduct

The parties dispute whether Weiler engaged in protected conduct. In particular, the Village argues that Deetjen's comments were not racially discriminatory and that any such interpretation is unreasonable. It does not matter whether Weiler's interpretation of Deetjen's comment was *correct*. The Seventh Circuit "has repeatedly held that a plaintiff need not . . . have opposed an action that in fact violated Title VII to win a retaliation claim." *Fine*, 305 F.3d 746, 752. A plaintiff must show that he took action in opposition to a form of discrimination that the statute prohibits, *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011), but he may be mistaken in his belief and still claim the protection of the statute. *Id.* A defendant may prevail on this basis only if the plaintiff does not honestly believe he is opposing a practice prohibited by the statute or if his belief is objectively unreasonable. *Id.*

The Village seeks to demonstrate that Weiler did not engage in protected conduct by pointing to alternative interpretations of the phrase "clientele" and explaining the reasons Deetjen says he opposed the House of Brides lease. At most, a reasonable jury could find that the Village demonstrated that Weiler's interpretations were inaccurate. But the Village did not present any evidence suggesting that Weiler did not honestly hold the belief. The Village actually *admitted* that Weiler held this belief, though it argued that he should not have. *See* Defs.' SOF ¶¶ 49-57. It pointed to a "universe" of undisputed facts that it argued should have cut against Weiler's belief that Deetjen's comments were racial in nature. In particular, it highlighted that Deetjen sent letters to Heilmann and the Village Board expressing his plan for the House of

8

Brides site months before the statements, that Deetjen repeatedly stated that the House of Brides location was retail in nature, that Deetjen was impressed with JenCare, and that the Men's Warehouse location was better from an economic development standpoint. The Village does not allege that Weiler received any of the letters Deetjen sent, nor does it allege that Weiler was privy to Deetjen's subjective opinions about JenCare. None of the facts alleged by the Village address Weiler's state of mind, which was the relevant inquiry. As such, a reasonable jury could find that Weiler honestly held a good-faith belief that Deetjen's comments were racial in nature.

The Village attempts to paint Weiler's belief as unreasonable by pointing to Weiler's lack of data or information to support his beliefs. It says that Weiler did not have demographic information for JenCare or seek clarification from Deetjen regarding what his clientele remark meant. Among other similar arguments, the Village argues that because the racial allegations about Deetjen at his former job were later found to be untrue, Weiler could not have reasonably relied upon them. But there is no evidence that Weiler was aware of the allegations' final disposition. Therefore, a reasonable jury could consider the allegations to the extent that their mere existence influenced Weiler's state of mind. Overall, no reasonable jury could find that Weiler's belief was held in bad-faith or was completely groundless. Because the undisputed record shows that Heilmann *thought* the comments were discriminatory—whether or not that belief ended up being true—a reasonable jury could find that his conduct was protected by Title VII and Section 1981.

    b.    **Causation**

It is undisputed that Weiler was subjected to an adverse employment action.

9

Defendants contend, however, that Weiler cannot show a causal connection between his report to Heilmann or Mayor-elect Bury and the elimination of Weiler's department. The causation element requires a plaintiff to prove that his protected conduct was a substantial or motivating factor in the adverse employment action. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). A plaintiff can prove causation by direct evidence—akin to an admission by the employer—or circumstantial evidence that would permit the same inference. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012).

Weiler attempts to make his case by presenting circumstantial evidence, which requires him to presents a "convincing mosaic" permitting an inference of causation. *Id.* This can include evidence of "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009).

Weiler primarily relies on evidence of suspicious timing and what he calls "the suspicious sequence of events" between his protected conduct and the Board meeting at which his department was eliminated. But suspicious timing is "rarely . . . sufficient in and of itself to create a triable issue." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). For this to be enough to survive summary judgment, a plaintiff generally must show that "an adverse employment action follows close on the heels of protected expression." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). There is no set interval, but "the closer two events are, the more likely that the first caused the second." *Id.* In the Seventh Circuit, suspicious timing claims are typically successful only if the time elapsed between the protected conduct and the adverse action is a few days or less. *See id.* ("For an inference of causation to be drawn solely on the basis of a

suspicious timing argument, we typically allow no more than a few days to elapse between the protected activities and the adverse action.").

In *Kidwell*, the Seventh Circuit held that the five-week and two-month time periods at issue were too extended to support an inference of retaliation. Here, the interval is longer than that. Deetjen allegedly made the comments on April 17, and Weiler reported them to then-Mayor Heilmann on April 26. Deetjen made the recommendation to eliminate Weiler's department on August 13. The interval between late April and mid-August is too long under governing Seventh Circuit authority to support a reasonable inference of causation without other evidence supporting a finding of causation, which is lacking here. And even if the interval is narrower—for example, the seven-week interval between Weiler's discussion of the Deetjen's comments with incoming Mayor Bury on May 13-14 and Deetjen's presentation of the proposed retirement agreement to Weiler on July 2, it is still too long to support a reasonable inference of causation without other supporting evidence. Indeed, the Seventh Circuit held in *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008), that a seven-week time period is too long to support a reasonable inference of retaliation without other evidence.

In short, even when one views the evidence in the light most favorable to Weiler, the time intervals at issue are too extended to support a reasonable inference of causation. For this reason, the Village is entitled to summary judgment on Weiler's section 1981 and Title VII claims.

**2.      First Amendment retaliation**

Weiler asserts essentially the same arguments for his First Amendment claim,

with the focus in this context on the freedom of speech afforded by the First Amendment rather than the protection from discrimination afforded by Title VII and Section 1981. To set out a First Amendment retaliation claim, a plaintiff must demonstrate that 1) his speech was constitutionally protected; 2) he suffered a deprivation likely to deter free speech; and 3) his speech was a motivating factor in the employer's actions. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). For present purposes, the Court assumes that Weiler's speech (meaning his statements to Heilmann, Detective Cronin, and Mayor Bury) was protected conduct. And as explained, it is undisputed that Weiler faced an adverse employment action. As with the earlier claims, the disputed issue involves causation.

First Amendment claims of retaliatory discharge are governed by the causation analysis set forth by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 286 (1977). "The motivating factor requirement splits the burden of production between the parties on summary judgment." *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013). The plaintiff has the initial burden to produce evidence that his speech was at least a motivating factor in the employer's decision to take adverse action against him. *Id.* The defendant may then rebut by producing evidence that the harm would have occurred anyway, even without the protected conduct. *Id.* A plaintiff can prove causation by either direct or circumstantial evidence. *Kidwell*, 679 F.3d at 965.

Weiler's First Amendment claim falls short for the same reasons his section 1981 and Title VII claims do. Specifically, no reasonable jury could find on the record before the Court that Weiler's protected conduct (for this claim, his speech) motivated in any

way the Village's decision to eliminate his department. For this reason, the Village is entitled to summary judgment on Weiler's First Amendment claim.

### 3. State law claims

Because the Court has entered summary judgment entered in favor of the defendants on all of Weiler's federal claims, the sole basis for invoking federal jurisdiction has become nonexistent, and the court has the discretion to dismiss any remaining state law claims. 28 U.S.C. § 1367(c)(3); *see Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003). This is the appropriate course here, particularly given the potentially significant issues of state law encompassed by the parties' arguments regarding the applicability and application of the Illinois Tort Immunity Act. The Court therefore dismisses plaintiff's ICRA, IHRA, and Illinois Whistleblower Act claims for lack of supplemental jurisdiction.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment in part and denies it without prejudice in part [dkt. no. 87]. The Clerk is directed to enter judgment dismissing with prejudice Counts 1, 2, 3, 4, 5, 6, 7, 8, and 12 of plaintiff's second amended complaint and dismissing for lack of jurisdiction Counts 9, 10, and 11 of plaintiff's second amended complaint..

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 2, 2016